1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-mail: swestcot@bursor.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

TANNER HERZMAN, individually and on behalf of all others similarly situated,

                              *Plaintiff*,

v.

SMILE BRANDS INC. d/b/a
BRIGHT NOW! DENTAL &
ORTHODONTICS,

                              *Defendant.*

Case No. **'25CV3400 H    BLM**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Tanner Herzman ("Plaintiff") brings this class action complaint on behalf of himself, and all others similarly situated, against Defendant Smile Brands Inc. d/b/a Bright Now! Dental & Orthodontics ("Bright Now" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all patients who scheduled or requested an appointment for dental services on the website, www.brightnow.com (the "Website").[1]

2.      Defendant is one of the largest providers of dental support services in the United States, partnered with over 600 offices across 29 states.[2]  Defendant provides an array of dental services and treatments to its patients, including clear aligners, dental implants, specialty dentistry, general dentistry, and cosmetic dentistry.

3.      Confidentiality is paramount to the medical and dental industries. Respecting a patient's decision to exercise their autonomy in providing personal and sensitive details about their health is vital in building trust with their clinicians.[3]

---

[1] Smile Brands Inc. has a number of regional brands and groups including Monarch Dental & Orthodontics, Castle Dental & Orthodontics, Midwest Dental, Merit Dental, Mondovi Dental, DecisionOne Dental Partners, A+ Dental Care, Johnson Family Dental, and Bright Now! Dental & Orthodontics. *Your search is over*, SMILE BRANDS https://smilebrands.com/smile-brands-locations/ (last visited Dec. 2, 2025).
[2] *We're everywhere you want to be*, SMILE BRANDS https://smilebrands.com/smile-brands-locations/ (last visited Dec. 2, 2025).
[3] *See Ethics in Dentistry: Confidentiality,* DENTAL CARE https://www.dentalcare.com/en-us/ce-courses/ce510/confidentiality ("The requirement for confidentiality is mentioned in all codes of ethics as well as the Hippocratic oath.").

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    1

4.      When a patient pursues dental care, they are entitled to legal protection from the unauthorized disclosure of their personally identifiable information ("PII") and their protected health information ("PHI") to third parties.

5.      When patients know their information is secure, they are more likely to pursue important dental health services.

6.      Information related to dental health treatment is protected by state and federal law, including but not limited to, the Health Insurance Portability and Accountability Act ("HIPAA").[4]   Dental healthcare providers—like Defendant—are legally required to safeguard patients' confidential and sensitive health information. These protections cover all data related to a patient's dental health, treatment history, and patient status.  With these protections in place, patients have a reasonable expectation that PHI related to their dental appointments will remain confidential.

7.      As a business associate to dental practices, Defendant is subject to HIPAA and the Privacy Rule.

8.      Despite legal and ethical duties to maintain patients' confidential information, Defendant instead secretly intercepts and discloses Plaintiff's and Class Members' sensitive and confidential dental information to third parties.  In doing so, Defendant undermines the importance of safeguarding the identities and personal medical information of individuals seeking dental services.  Moreover, it breaches the trust of patients—by violating state and federal law.

9.      Unbeknownst to Plaintiff and Class Members, and contrary to Defendant's duties as a dental provider, Defendant discloses its patients' PHI to third parties, including Google, for targeted advertising purposes.  Due to Defendant's illegal activity, Plaintiff brings this action seeking legal and equitable remedies.

---

[4] 42 U.S.C. § 1320 *et seq.*

**THE PARTIES**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10.     Plaintiff Tanner Herzman is a resident of Oceanside, California.  On or around October 2024, Plaintiff made an appointment using the Website for dental services at Defendant's Bright Now location in Oceanside, California.[5]  At all relevant times, Plaintiff maintained an active Google account.

11.     Unbeknownst to Plaintiff, Defendant disclosed his PHI—including the specific details about his dental appointments—to Google for targeted advertising purposes.  Defendant also intercepted and disclosed to Google personally identifiable information ("PII") sufficient to identify Plaintiff as the precise individual booking dental appointments.

12.     Plaintiff used the same device and browser used to access his Google account when navigating the Website.  After booking appointments on the Website, Plaintiff began receiving targeted advertisements for similar products and services. However, Plaintiff did not know, and had no way of knowing, why he was receiving such targeted advertisements or that he was receiving such targeted advertisements because Defendant unlawfully disclosed his PHI to third parties without his consent. Plaintiff would not have made an appointment on the Website if he knew Defendant was sharing his PHI with unknown third parties.

13.     When registering for his Gmail accounts, Google required that Plaintiff provide his full name, date of birth, and gender.  Every time Plaintiff accesses his Gmail account, Google collects information related to his IP address and electronic device (*e.g.*, browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes.  Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed herein.  Google utilizes

---

[5] The specific dental services scheduled by Plaintiff have been intentionally omitted to protect his privacy.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED          3

these tracking features to build robust consumer profiles it can leverage for advertising and marketing purposes.

14.     Defendant Smile Brands, Inc. is a Washington corporation with its principal place of business in Costa Mesa, California.  Defendant Smile Brands, Inc. owns and operates the Website.

15.     Defendant chose to embed Google's tracking technologies (the "Tracking Technologies") on the Website, whereby Defendant disclosed the confidential PHI of its patients with Google for targeted advertising purposes. Defendant acted without the authorization or consent of its patients.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

17.     This Court has personal jurisdiction over Defendant because it purposefully directs its business activities in this District by offering its services to residents of this District and performing services within this District.  Further, Plaintiff was residing in this District when he accessed the Website and had the Tracking Technologies installed on his device, which Defendant knew would cause harm throughout California, including within this District.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District,

Plaintiff resides in this District, and the interception of Plaintiff's personal information occurred in this District.

## FACTUAL ALLEGATIONS

**A.    Background of the California Invasion of Privacy Act and the Federal Wiretap Act**

19.    The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

20.    To establish liability under California Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

21.    Section 631(a)'s applicability is not limited to phone lines but also applies to "new technologies" including computers, the internet, and email.  *See*

*Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

22.    Similarly, Section 632 makes it unlawful for:

> A person [to] ***intentionally and without the consent of all parties*** to a confidential communication, use[] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio . . . .

23.    Under California Penal Code § 637.2, Plaintiff may seek injunctive relief and statutory damages of $5,000 per violation.

24.    In a manner similar to CIPA, the Federal Wiretap Act (i.e., the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[6]

25.    Although the ECPA usually applies "where one part[y] to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[7]

## B.    Dental-Related Health Information is Sensitive and Confidential

26.    Defendant, through its Tracking Technologies, disclosed information that is sensitive, confidential, and personally identifiable to Google.

---

[6] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).
[7] 18 U.S.C. § 2511(d).

27.     Defendant owns and operates the Website, where its patients can schedule appointments for various dental services including clear aligners, dental implants, general dentistry, specialty dentistry, and cosmetic dentistry services.

28.     Under federal law, healthcare providers—including dentists and their business associates—may not disclose PII or PHI without the patient's express written authorization.[8]  In this case, PHI includes, but is not necessarily limited to, patient status.

29.     The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule ("Privacy Rule"), to explain the duties healthcare providers owe to their patients.  "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[9]

30.     In 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), making business associates of HIPAA covered entities directly liable for compliance with certain requirements of the Privacy Rule.[10] Those requirements include the impermissible uses and disclosures of PHI.[11]

31.     A healthcare provider or business associate violates the Privacy Rule if it knowingly and in violation of 42 U.S.C. § 1320d-6(a): "(1) uses or causes to be

---

[8] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).
[9] U.S. DEPT. OF HEALTH & HUM. SERVS., THE HIPAA PRIVACY RULE, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last accessed July 17, 2025).
[10] American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat 115; *see also* 42 U.S.C. § 17931(b) (applying civil and criminal penalties to business associates for violations of 42 U.S.C. § 1320d-6).
[11] U.S. DEPT. OF HEALTH & HUM. SERVS., DIRECT LIABILITY OF BUSINESS ASSOCIATES, https://hhs.gov/hipaa/for-professionals/privacy/guidance/business-associates/factsheet/index.html.

used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." [12]

32.    The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of this part if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization."[13]

33.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant because it knowingly intercepts and discloses the individually identifiable health information of its patients.

34.    Defendant further failed to comply with other HIPAA safeguard regulations as follows:

    a.  Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

    b.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C. Section 164.308(a)(1);

    c.  Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

    d.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

    e.  Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to

---

[12] 42 U.S.C. § 1320d-6.
[13] *Id.*

1  individually identifiable health information in violation of 45 C.F.R.
2  Section 164.306(a)(3); and

3     f.  Failing to design, implement and enforce policies and procedures that
4  would establish physical and administrative safeguards to reasonably
5  safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

6     35.  Healthcare organizations regulated by HIPAA, like Defendant, may
7  only use third-party tracking tools in a limited way, to perform analysis on data key
8  to operations. They are not permitted, however, to use these tools in a way that may
9  expose patients' PHI to vendors (as shown below). As explained by a statement
10  published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.**[14]

16     36.  The Bulletin discusses the types of harm that disclosure may cause to
the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for**

---

[14] U.S. DEPT. OF HEALTH & HUM. SERVS., USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin") (emphasis added), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED    9

**regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[15]

37.    Plaintiff and Class Members face the same risks the government has expressed concern over.  Defendant's violative conduct facilitates third-party interception of PHI when Plaintiff and Class Members schedule dental appointments on Defendant's Website.

38.    The Bulletin goes on to further emphasize the breadth of the government's view on patient information.  It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well **as an individual's IP address** or **geographic location**, medical device IDs**, or any unique identifying code.**[16]

39.    Crucially, the Bulletin continues:

> **All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI**, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as **IP address** or **geographic location**, does not include specific treatment or billing information like dates and types of health care services.  This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus **relates to the individual's past, present, or future health or health care** or payment for care.[17]

40.    In July of 2022, the Federal Trade Commission ("FTC") and the HHS issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

---

[15] *Id.* (emphasis added).
[16] *Id.* (emphasis added).
[17] *Id.* (emphasis added).

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, **medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.**[18]

41.    The FTC is unequivocal in its stance. Healthcare companies, like Defendant, have been informed that they should not use tracking technologies to collect sensitive health information and subsequently disclose this information to third party advertising platforms without informed consent:

The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.

---

[18] FED. TRADE COMM'N, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Jul. 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (emphasis added).

For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.

[I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[19]

42.     HIPAA requires a heightened "authorization" requirement to disclose protected health information and personally identifiable information. While consent may allow certain uses or disclosures of PHI for treatment, payment, or healthcare operations, it is not sufficient for uses or disclosures that require an authorization under 45 C.F.R. § 164.508, which encompasses most uses, including marketing. *Compare* 45 C.F.R. § 164.506 (consent); *with* 45 C.F.R. § 164.508 (authorizations).

43.     The HIPAA de-identification rule reaffirms the positions of the HHS and the FTC.   The pertinent provisions of 45 C.F.R. § 164.514 state information is not individually identifiable only if:

(b) Implementation specifications: Requirements for de-identification of protected health information. A covered entity may determine that health information is not individually identifiable health information only if:

. . .

(2)(i) The following identifiers of the individual or of relatives, employers, or household members of the individual, are removed:

(A) Names;

(B) All geographic subdivisions smaller than a State . . . .;

(C) All elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death; and all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older;

---

[19] FED. TRADE COMM'N, COLLECTING, USING, OR SHARING CONSUMER HEALTH INFORMATION? LOOK TO HIPAA, THE FTC ACT, AND THE HEALTH BREACH NOTIFICATION RULE, https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach.

(D) Telephone numbers;

(E) Fax numbers;

(F) Electronic mail addresses;

(G) Social security numbers;

(H) Medical record numbers;

(I) Health plan beneficiary numbers;

(J) Account numbers;

(K) Certificate/license numbers;

(L) Vehicle identifiers and serial numbers, including license plate numbers;

(M) Device identifiers and serial numbers;

(N) Web Universal Resource Locators (URLs);

(O) Internet Protocol (IP) address numbers;

(P) Biometric identifiers, including finger and voice prints;

(Q) Full face photographic images and any comparable images; and

(R) Any other unique identifying number, characteristic, or code, except as permitted by paragraph (c) of this section; and

(ii) The covered entity does not have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information.

44.    The HHS has further instructed that patient status alone is protected:

- "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

- "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which would include disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

▪ It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

▪ The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

45. Defendant's conduct, as described herein, directly conflicts with federal law and clear pronouncements by the FTC and HHS.

## C.    Tracking Technologies, Generally

46. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

47. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

48. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- <u>HTTP Request</u>: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- <u>Cookies</u>: a small text file that can be used to store information on the

device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- <u>HTTP Response</u>: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

49.    A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

50.    Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

51.    Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Google's Tracking Technologies embedded on the Website by Defendant constitute Source Code.

**D.    Google's Advertising Technologies**

52.    Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

53.    Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both

performance advertising and brand advertising."[20]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

54.    Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

55.    One of these analytics products is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

56.    Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics

---

[20] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

57.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

58.    Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

59.    Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[21]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[22]

60.    Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen

---

[21] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.
[22] *Id.*

1    resolution.

2        61.    Once Google's software code collects the data, it packages the

3    information and sends it to Google Analytics for processing.  Google Analytics

4    enables the company or advertiser to customize the processing of the data, such as

5    applying filters.  Once the data is processed, it is stored on a Google Analytics

6    database and cannot be changed.

7        62.    After the data has been processed and stored in the database, Google

8    uses this data to generate reports to help analyze the data from the webpages.  These

9    include reports on acquisition (e.g., information about where your traffic originates,

10   the methods by which users arrive at your site or app, and the marketing efforts you

11   use to drive traffic), engagement (e.g., measure user engagement by the events and

12   conversion events that users trigger and the web pages and app screens that user

13   visits, and demographics (e.g., classify your users by age, location, language, and

14   gender, along with interests they express through their online browsing and purchase

15   activities).

16       63.    In addition to using the data collected through Google Analytics to

17   provide marketing and analytics services, Google also uses the data collected

18   through Google Analytics to improve its ad targeting capabilities and data points on

19   users.

20       64.    Google Analytics links with Google Ads, so that Google may use the

21   data intercepted by Google Analytics to be utilized for targeted advertising

22   purposes.[23]  Such practices were in effect on Defendant's Website at all relevant

23   times.

24       65.    The DoubleClick API "is an integrated ad technology platform that

25   enables advertisers to more effectively create, manage and grow high-impact digital

26

27   _____

     [23] *Connect Google Ads to Google Analytics*, GOOGLE,

28   https://support.google.com/analytics/answer/9379420?hl=en.

1    marketing campaigns."[24]

2    66.    DoubleClick was acquired by Google in 2008.  In 2018, the

3    DoubleClick API was integrated with the Google Analytics API into the Google

4    Marketing Platform.[25]  The Google Marketing Platform makes use of most of

5    DoubleClick's features, albeit under different brand names: for example,

6    "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is

7    now named Search Ads 360," and DoubleClick Campaign Manager and DoubleClick

8    Studio are now named Campaign Manager and Studio, respectively."[26]

9    67.    As relevant here, however, data is still sent from the Website to Google

10    through the DoubleClick API, and users like Defendant can then use the Google

11    Marketing Platform to manage the data.  This process is akin to a person setting an

12    old e-mail address to automatically forward messages to a new e-mail address, rather

13    than manually updating their contact information on a number of different websites.

14    Messages would still be sent to the old e-mail address, but would be routed to the

15    same end recipient, the same way data sent to DoubleClick still ends up with Google.

16    68.    Once Defendant intercepts the Website communications through the

17    DoubleClick API and discloses such information to Google (in real time), Google

18    has the capability to use such information for its own purposes.  "Google uses the

19    information shared by sites and apps to deliver [] services, maintain and improve

20    them, develop new services, measure the effectiveness of advertising, protect against

21    fraud and abuse, and personalize content and ads you see on Google and on []

22

23

24    [24] GOOGLE, DOUBLECLICK DIGITAL MARKETING,
https://support.google.com/faqs/answer/2727482?hl=en.

25    [25] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING
PLATFORM (June 27, 2018),

26    https://www.blog.google//products/marketingplatform/360/introducing-google-
marketing-platform/.

27    [26] GOOGLE, INTRODUCING GOOGLE MARKETING PLATFORM,
https://support.google.com/displayvideo/answer/9015629?hl=en

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    19

partners' sites and apps."[27]

69.    For example, Google utilizes the "auid" or "Advertiser User ID" cookies which identify unique users and unique interactions with a website.

70.    Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

71.    Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

72.    In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

73.    Google views and processes every piece of information collected from the DoubleClick API, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

74.    Google partners with Defendant in its marketing efforts.  The DoubleClick API is employed on the Website in the manner described throughout this Complaint.

75.    The Website utilizes Google's pixel and SDK.  As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the specific

---

[27] GOOGLE, PRIVACY AND TERMS, https://policies.google.com/technologies/partner-sites.

dental treatment being received by the patient.  Google also received additional PII, including the patients' IP address, device information, and User-IDs.

76.    Google collects vast quantities of consumer data through its tracking technology.

77.    Due to the vast network of consumer information held by Google, it can match IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

78.    Google then utilizes such information through targeted advertising.

79.    Information from websites, like Defendant's, is central to Google's ability to successfully market their advertising capabilities to future clients.

80.    In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

81.    Google views and processes every piece of information collected from the Google Analytics and DoubleClick tracking technologies, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

82.    Google partners with Defendant in its marketing efforts.  The Google Analytics and DoubleClick tracking technologies are employed on the Website in the manner described throughout this Complaint.

**E.    Defendant Violates the Privacy Rights of its Patients**

83.    "Smile Brands provides comprehensive business support services through exclusive long-term agreements with affiliate dental groups . . . . Through acquisitions and the opening of new dental offices, Smile Brands has become a dominant player in the dental space with a rapidly growing number of affiliated

1  practices across 29 states."[28]

2      84.    Defendant understands the information handled on its Website is

3  protected and confidential.

4      85.    Unfortunately, Defendant does not comply with its legal and ethical

5  obligations.

6      86.    Defendant allows its patients to schedule in-person dental health

7  services on the Website.

8      87.    Defendant's patients access the Website to book appointments for

9  various dental services.

10      88.    Unbeknownst to its patients, Defendant disclosed sensitive details about

11  their dental appointments and PII to Google through the Tracking Technologies.

12      89.    When patients' book an appointment for dental services, Defendant

13  intercepts information related to its patients' appointments through Google's tracking

14  technologies, including the city and state the appointment is in and the service

15  selected. *See, e.g.* Fig. 1–2.

16      **Figure 1:**

17

18  Full Request                                                                    ⌃

   Full call                                                                       ⌃

19  https://www.google-analytics.com/g/collect?v=2&tid=G-
   4D5DW9N615>m=45je5bj1v9100321706za200zb76473907zd76473907&_p=1764722854903&gcd=
20  13l3l3l3l1l1&npa=0&dma=0&cid=901754822.1763653544&ul=en-
   us&are=1&frm=0&pscdl=noapi&_eu=BEAAAAQ&_geo=1&_rdi=1&_s=2&tag_exp=103116026~10320
21  0004~104527906~104528501~104684208~104684211~105391252~115583767~115616986~11
   5938465~115938468~116184927~116184929~116217636~116217638&sid=1764722811&sct=2
22  &seg=1&dl=https%3A%2F%2Fwww.brightnow.com%2Fappointment%2F%3Fofficeid%3D&dr=https
   %3A%2F%2Fwww.brightnow.com%2Fservices%2Fgum-
23  disease%2F&dt=Book%20an%20Appointment%20%7C%20Bright%20Now!%20Dental%20%26%20Ort
   hodontics&en=event_o&epn.percent_scrolled=90&_et=5&tfd=5677

24

25

26

27

28  [28] SMILE BRANDS, *Smiles for Everyone: Our Story*, https://smilebrands.com/about/.

**Figure 2:**



90.     The information disclosed to Google by Defendant allows Google to discern the identities of specific individuals in addition to the reason they are booking an appointment.  The result is that Defendant profits by using the intercepted data for targeted advertising purposes

91.     Defendant further discloses to Google the PII of their patients' sufficient for Google to uncover their identities.  In the HTTP communications shown in Figures 1 and 2, the patients' IP address is inherently included in every network request.  In addition to their patients' IP address, Defendant, through Google's tracking technologies, disclosed information about their specific devices and user-IDs to Google, allowing Google to link such information to an individual's specific identity.

92.     As shown in Figures 1 and 2, and described throughout, Plaintiff's communications with Defendant were disclosed by Defendant to Google and/or intercepted in transit by Google, in real time, via detailed URLs, which contain the medically sensitive information entered into the Website.

93.     Defendant also uses and causes the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed

communication described herein, including patient communications concerning individual dental appointments.

94.    Defendant sent out these identifiers (e.g. auid, cid, IP address, and device information) with each patient's "event" data.

95.    The information shared by Defendant with Google allows Google to discern identities of specific individuals, and associates this information with their appointment details and patient status.

96.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to intercept and disclose his confidential information to unknown third parties.

97.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to share his confidential health information.  Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

98.    By law, Plaintiff is entitled to privacy in his protected health information and confidential communications.  Defendant deprived Plaintiff of his privacy rights when they implemented a system that surreptitiously tracked and recorded Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.

**F.    Tolling**

99.    Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of Google's Tracking Technologies onto the Website.

100.   Google's Tracking Technologies are entirely invisible to a website visitor.

101.   Through no fault or lack of diligence, Plaintiff and members of the putative classes were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

102.   Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

103.   Defendant had exclusive knowledge that the Website incorporated the Tracking Technologies yet failed to disclose to its users, including Plaintiff, that by using Defendant's financial services through the Website, their PII and PHI would be disclosed to Google.

104.   Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users PII and PHI.  In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their PII and PHI to unauthorized third parties.  Accordingly, Defendant is estopped from relying on any statute of limitations.

105.   Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

106.   The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the initial complaint in this matter.

## **CLASS ACTION ALLEGATIONS**

107.   Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

**Nationwide Class:** All natural persons in the United States who, during the Class Period, scheduled an appointment for dental services on the Website.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**California Subclass:** All natural persons in the State of California who, during the Class Period, scheduled an appointment for dental services on the Website.

108.    Excluded from the Classes are Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or has had a controlling interest.

109.    Plaintiff is a member of the Classes he seeks to represent.

110.    The Classes are ascertainable because the Class Members can be identified by objective criteria – all individuals who accessed the website, www.brightnow.com to book an appointment for dental services.  Individual notice can be provided to Class Members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

111.    <u>Numerosity</u>.  The Classes are so numerous that joinder of all members is impractical.  Although Plaintiff does not yet know the exact size of the Classes, it is believed that there are at least thousands of Class Members.

112.    <u>Commonality</u>.  There are numerous questions of law and fact common to the Classes, which predominate over any individual actions or issues, including but not limited to:

      a.   Whether Defendant gave the Class Members a reasonable expectation of privacy that their information was not being shared with third parties;

      b.   Whether Defendant's disclosure of information constitutes a violation of the claims asserted;

      c.   Whether Plaintiff and Class Members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

d.  Whether Plaintiff and Class Members have sustained damages as a result of Defendant's conduct and if so, what is the appropriate measure of damages or restitution.

113.  <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the members of the Classes, as all members are similarly affected by Defendant's wrongful conduct.  Plaintiff has no interests antagonistic to the interests of the other members of the Classes.  Plaintiff and all members of the Classes have sustained economic injury arising out of Defendant's violations of law as alleged herein.

114.  <u>Adequacy</u>.  Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained counsel competent and experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class Members will be fairly and adequately protected by Plaintiff and his counsel.

115.  <u>Superiority</u>.  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of liability issues will ensure that all claims are consistently adjudicated.

116.   Plaintiff reserves the right to revise his allegations and class definition based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Electronic Communications Privacy Act ("ECPA")**
**18 U.S.C. § 2511(1)** *et seq.*
**(On Behalf Of The Nationwide Class)**

117.   Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

118.   Plaintiff brings this Count individually and on behalf of the members of the Class.

119.   The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

120.   The ECPA protects both the sending and the receipt of communications.

121.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

122.   The transmission of Plaintiff's PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

123.   The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

124.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

125.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

126.    The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]"  18 U.S.C. § 2510(5).

127.    The following instruments constitute "devices" within the meaning of the ECPA:

a.  The computer codes and programs Defendant and Google used to track Plaintiff and Class Members communications while they were navigating the Website;

b.  Plaintiff's and Class Members' browsers;

c.  Plaintiff's and Class Members' mobile devices;

d.  Defendant's and Google's web and ad servers;

e.  The plan Defendant, and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

128.    Plaintiff's and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

129.    When a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to third parties at the same time as they are being sent to Defendant.  This process occurs within milliseconds.

130.   By utilizing and embedding the Tracking Technology provided by Google on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

131.   Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the Tracking Technologies provided by Google on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI.

132.   Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, including their identities and information related to the dental services they received.  This confidential information is then monetized for targeted advertising purposes, among other things.

133.   By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

134.   By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

135.   Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPAA and invasion of privacy, among others.

136.   The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3).  This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party.  HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[29]

137.   The information that Defendant disclosed to Google qualifies as IIHI and Defendant violated Plaintiff's and Class Members' expectations of privacy.  Such conduct also constitutes as tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6.  Defendant used electronic communications to increase its profit margins.  Defendant specifically used the Tracking Technologies provided by Google to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

138.   Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

139.   Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy.  Plaintiff and Class Members, all of whom are patients of Defendant, had a reasonable expectation that Defendant would not redirect their communications to Google without their knowledge or consent.

---

[29] 42 U.S.C. § 1320d-6.

140.   The foregoing acts and omissions therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

141.   As a result of each violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

## COUNT II
### Violation of the California Invasion of Privacy Act ("CIPA")
### Cal. Penal Code § 631(a)
### (On Behalf Of The California Subclass)

142.   Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

143.   Plaintiff brings this Count individually and on behalf of the members of the California Subclass.

144.   CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

145.   CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

146.   The Tracking Technologies are each a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

147.   Google is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, Google has the capability to use and do use the wiretapped information for its own purposes.  Accordingly, Google is a third party to any communication between Plaintiff and California Subclass Members, on the one hand, and Defendant, on the other.  *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

148.   At all relevant times, the Tracking Technologies willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and members of the California Subclass, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

149.   At all relevant times, Google used or attempted to use the communications intercepted to, *inter alia*, monitor and improve its products and services.

150.   At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Google to wiretap Plaintiff and members of the California Subclass through the Tracking Technologies and to accomplish the wrongful conduct at issue here.

151.   Plaintiff and members of the California Subclass did not provide their prior consent to the intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass members' electronic communications.  Nor did Plaintiff and California Subclass members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Google's conduct.

152.   The wiretapping of Plaintiff and California Subclass members occurred in California, where Plaintiff and California Subclass members accessed the Website and where the Tracking Technologies—as enabled by Defendant—routed Plaintiff's and California Subclass members' electronic communications to its servers.

153.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

**COUNT III**
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 632**
**(On Behalf Of The California Subclass)**

154.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

155.   Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

156.   CIPA § 632(a) prohibits an entity from:

intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to

eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

157.    The Tracking Technologies are "electronic amplifying or recording device[s]."

158.    At all relevant times, Defendant assisted Google in eavesdropping upon and recording such confidential communications of Plaintiff and California Subclass members, on the one hand, and Defendant, on the other.

159.    When communicating with Defendant, Plaintiff and California Subclass members had an objectively reasonable expectation of privacy, based on HIPAA. Thus, Plaintiff and California Subclass members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other third-party entities would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and California Subclass members.

160.    Plaintiff and California Subclass members did not consent to any of Google's actions.  Nor have Plaintiff or California Subclass members consented to any of Defendant's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and California Subclass members.

161.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## COUNT IV
### Invasion of Privacy Under California's Constitution
### (On Behalf Of The California Subclass)

162.   Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

163.   Plaintiff brings this claim on behalf of himself  and members of the California Subclass against Defendant.

164.   The highly sensitive and personal information of Plaintiff and California Subclass members consists of private and confidential facts and information regarding Plaintiff's and California Subclass members' medical appointments that were never intended to be shared beyond private communications on the Website and the consideration of dental professionals.

165.   Plaintiff and California Subclass members had a legitimate expectation of privacy regarding their PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third Parties, such as Google.

166.   Defendant owed a duty to Plaintiff and California Subclass members to keep their PHI and PII confidential.

167.   Defendant's unauthorized disclosure of Plaintiff's and California Subclass members' PHI and PII to Google, one of the world's largest technology and marketing companies, is highly offensive to a reasonable person.

168.   Defendant's willful and intentional disclosure of Plaintiff's and California Subclass members' PHI and PII constitutes an intentional interference with Plaintiff's and California Subclass members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

169.   Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and California Subclass members' privacy because Defendant

facilitated Google's simultaneous eavesdropping and wiretapping of confidential communications.

170.    Defendant failed to protect Plaintiff's and California Subclass members' PHI and PII and acted knowingly when it installed the tracking technology onto the Website because the purpose of said technology is to track and disseminate users' communications on the Website for marketing and advertising.

171.    Because Defendant intentionally and willfully incorporated the tracking technology onto the Website and encouraged individuals to use and interact with the Website and the services thereon, Defendant had notice and knew that this practice would cause injury to Plaintiff and the California Subclass.

172.    As a proximate result of Defendant's acts and omissions, the PHI and PII of Plaintiff and California Subclass members were disclosed to third parties, causing Plaintiff and the California Subclass to suffer damages.

173.    Plaintiff, on behalf of himself  and California Subclass members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, lost benefit of the bargain and pre-judgment interest and costs.

174.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the California Subclass since their PHI and PII is still maintained by Defendant and is still in the possession of third parties, and the wrongful disclosure of this information cannot be undone.

175.    Plaintiff and California Subclass members have no adequate remedy at law for the injuries relating to Defendant's and unauthorized third party's continued possession of their sensitive and confidential information.  A judgment for monetary damages will not undo Defendant's disclosure of the information to unauthorized third parties who, upon information and belief, continue to possess and utilize the information.

176.   Plaintiff, on behalf of himself  and California Subclass members, further seeks injunctive relief to enjoin Defendant from intruding into the privacy and confidentiality of Plaintiff's and California Subclass members' PHI and PII and to adhere to its common law, contractual, statutory and regulatory duties.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)   Determining that this action is a proper class action;

(b)   For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorney(s) as Class Counsel to represent the Classes;

(c)   For an order declaring that Defendant's conduct violates the statutes referenced herein;

(d)   For an order finding in favor of Plaintiff and the Classes on the counts asserted herein;

(e)   Awarding compensatory damages, including statutory damages where available, to Plaintiff and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

(f)   For punitive damages, as warranted, in an amount to be determined at trial;

(g)   Ordering Defendant to disgorge revenues and profits wrongfully obtained;

(h)   For prejudgment interest on all amounts awarded;

(i)   For injunctive relief as pleaded or as the Court may deem proper;

(j)   For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

1    (k)    Granting Plaintiff and Class Members such further relief as the Court

2    deems appropriate

3    **<u>JURY TRIAL DEMANDED</u>**

4    Plaintiff hereby demands a trial by jury on all claims so triable in this action.

5

6    Dated: December 3, 2025.

7    Respectfully submitted,

8    **BURSOR & FISHER, P.A.**

9    By:____*/s/ Sarah N. Westcot*_____
10          Sarah N. Westcot

11    Sarah N. Westcot (State Bar No. 264916)
      701 Brickell Ave., Suite 2100
12    Miami, FL 33131
      Telephone: (305) 330-5512
13    Facsimile: (305) 679-9006
      E-mail: swestcot@bursor.com
14

15    *Counsel for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED    39